**GORGES FOODSERVICE,
INC. Appellant,**

v.

**Guadalupe HUERTA, Appellee.**

**No. 13–96–308–CV.**

Court of Appeals of Texas,
Corpus Christi.

Nov. 6, 1997.

Rehearing Overruled Jan. 22, 1998.

Charles C. Murray, Lisa D. Powell, Curtis Bonner, Atlas & Hall, McAllen, for Appellant.

Aaron Pena, Jr., David H. Jones, Kathleen Henley, Aaron Pena & Associates, Edinburg, for Appellee.

Before SEERDEN, C.J., and FEDERICO G. HINOJOSA, Jr. and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

Guadalupe Huerta won a judgment against his former employer Gorges Foodservice

(Gorges) on claims for intentional infliction of emotional distress and wrongful discrimination under both the Workers' Compensation Act[1] and the Texas Commission on Human Rights Act.[2] He was awarded $35,500 in past lost wages, $218,400 in future lost wages, and $150,000 to compensate for mental anguish, with prejudgment interest on the entire sum of actual damages. Huerta was also awarded $500,000 in punitive damages and $125,490.75 in attorney's fees and costs. Gorges appeals by seventeen points of error. We reverse the finding of liability for intentional infliction of emotional distress and the recovery of prejudgment interest on the damages awarded for lost wages in the future, and suggest a remittitur of part of the damages awarded for lost wages in the future. We overrule all of appellant's other points of error.

### Facts

Huerta was injured on February 14, 1992. He filed a claim for worker's compensation with the Texas Worker Compensation Commission. Huerta was assigned to "light duty" forming boxes. However, Huerta complained that standing while forming the boxes aggravated his back. Huerta received two other light duty assignments, in the kitchen and as a parking lot security guard. In the kitchen, the combination of the heat and Huerta's pain medication caused him to lose his balance and he fell and hurt himself again. Huerta testified that while he was working in the parking lot Gorges required him to wear a yellow fireman's hat. He said he was the only Gorges employee ever made to wear such a hat. Stacy Buford, Gorges's personnel manager, testified that the hat was an ordinary hard hat, not a fireman's hat, and that all employees on light duty were required to wear them so they could be readily identified and shielded from hazardous tasks.

Huerta testified that Gorges management refused to allow him access to a restroom in an office near the parking lot, so he was forced to walk a much further distance to access water and a toilet. When he made it back to his post approximately thirty minutes later, he was reprimanded for being away from his post for so long and threatened with

termination if he was absent for such a long time again. Stacy Buford testified that Huerta never complained about the distance he had to travel from the parking lot to a restroom. She estimated that it would take "three or four minutes, five max" to walk from the parking lot to the restroom Huerta testified that he had used, and denied any intent to limit Huerta's access to a restroom. Buford's records reflected that Huerta was removed from his post at the parking lot because being in the sun and on medication made him dizzy.

Next, in July and August of 1992, Huerta was assigned to work as a night security guard at a Gorges freezer plant. Huerta testified that Gorges management had told him that at this new job he would be provided with access to a telephone and a restroom; however the security employees at the freezer plant told Huerta they had been instructed to deny him access to telephones and restrooms. Gorges's records reflected that Huerta complained that he could not work as a night security guard because his children did not let him sleep during the day. Huerta admitted that he had complained about the night assignment, but said that he had ultimately accepted it because he was told it was the only job available for him. Gorges's records showed that Huerta did not work for Gorges after August 29, 1992. A review of Huerta's medical records reveals frequent doctor's visits from May 1992 through October 1992, and frequent periods when Huerta was unable to work for medical reasons.

At some stage Huerta hired an attorney to assist him with his workers' compensation claim. In October 1992 Huerta came to Gorges's office to present a "light duty" release for returning to work. However, Huerta testified that Gorges's staff and its insurance agent would not talk to him, and it was his understanding that he was receiving this treatment because he had hired a lawyer. Shortly thereafter Huerta wrote a letter dismissing his lawyer, which he delivered to the Workers' Compensation Commission and to Gorges. Stacy Buford testified that she had

---

1. TEX.LAB.CODE ANN. § 451.001, et seq. (Vernon 1996).

2. TEX.LAB.CODE ANN. § 21.001, et seq. (Vernon 1996).

no knowledge of anyone at Gorges telling Huerta that he had to fire his lawyer. Buford explained that a decision was made in August 1992 not to put Huerta back to work at any light duty tasks because the light duty tasks seemed only to be causing Huerta further injury, and that Huerta would only be put back to work when he obtained a full duty release. She acknowledged that Gorges's policy was to offer light duty assignments to injured employees who had doctors' releases to return to work on light duty status.

In August and September 1993 Huerta brought light duty releases to Gorges, but he was not put back to work. Huerta testified that on October 15, 1993 he obtained a full duty release to return to work without restrictions, which he took to Gorges. Buford testified that she did not receive the full duty release. On October 26, 1993, Huerta received a letter signed by Buford which he interpreted as a termination letter. The letter noted statements Gorges had received from doctors who had examined Huerta, and then stated:

> The medical opinion states that you should "avoid repeated bending and lifting of heavy objects," you "may not be able to lift over 50 pounds," and "may not be able to lift continuously over 20–25 pounds" and "should avoid repeated climbing of steps." The opinion also states "you are experiencing mild degenerative changes and have limitations of motion of the spine."

> Based on the two doctors' evaluations, it is our opinion you would be at risk working at Gorges Foodservice, Inc. We do not have a permanent light duty position available. Even if such a position were available, you would have to climb stairs to the welfare room which the doctor's medical opinion states you should avoid.

Buford testified that her intent in writing the letter was to place Huerta on unpaid medical leave until he got a full release. However, an expert in the field of labor practices, upon examining the letter and Gorges's policy regarding medical leaves of absence, concluded that Buford did not follow procedures required by Gorges's policy, such as recording the leave status in writing and indicating a date when the leave was to commence. Matt Gorges, Gorges's Chairman of the Board, said in deposition testimony that Huerta was not on medical leave of absence. On November 4, 1993 Huerta obtained another full duty release, which was addressed to Gorges's insurance agent and found its way to Gorges shortly before Thanksgiving. Buford testified that she called Huerta in early December and told him to return to work on January 3, 1994, which he agreed to do. Huerta denied having this conversation with Buford. Huerta did not show up for work in January, and, according to Gorges's version of the facts, he was terminated on January 31, 1994 for failing to report to work.

### Exhaustion of Administrative Remedies

 Gorges's seventeenth point of error argues Huerta should be barred from any recovery under the Workers' Compensation Act because the evidence was legally and factually insufficient to prove that he had properly perfected his claim by filing a timely complaint with the Texas Commission on Human Rights. When we review a legal sufficiency challenge, we consider only the evidence and inferences that would support a finding on the disputed point and disregard all evidence to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992); *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). If the finding is supported by probative evidence, then we overrule the point and uphold the finding. *Southern States Transp.*, 774 S.W.2d at 640. However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). When confronting a factual insufficiency challenge, we consider all of the evidence presented. *Browning—Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993); *Cantu v. Butron*, 921 S.W.2d 344, 348 (Tex. App.—Corpus Christi 1996, writ denied). We overturn findings only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

Before seeking redress from a district court, parties who believe they have been the victims of illegal employment discrimination must exhaust their administrative remedies by filing a complaint with the Texas Commission on Human Rights ("the Commission") no later than 180 days after the alleged illegal discrimination. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 488 (Tex.1991). After a copy of a perfected complaint has been filed, the Commission is to serve the employer with a copy of the complaint within ten days. TEX.LAB.CODE ANN. § 21.201(d) (Vernon 1996). A party who has filed a timely complaint may request "written notice of the complainant's right to file a civil action" from the Commission. TEX.LAB.CODE ANN. § 21.252(a) (Vernon 1996). If the complaint is not filed with the Commission in a timely manner, the Commission is required to dismiss the complaint. TEX.LAB.CODE ANN. § 21.202 (Vernon 1996).

In this case, the alleged retaliatory discharge took place on October 26, 1993. Therefore, the deadline for Huerta to file a complaint was April 26, 1994. Huerta testified that he filed a complaint with the Commission, although he did not provide the date of the filing. A copy of an undated letter to Huerta from the Commission giving him notice of his right to file a civil action was admitted into evidence. There is a letter in evidence from the Commission, dated June 15, 1995, which acknowledges receipt of Huerta's request for "notice of right to file civil action" and acknowledges that a complaint from Huerta was on file. Appellant maintains that Huerta presented no evidence that his complaint was filed in a timely manner. We hold, however, that the jury could have rationally inferred that Huerta's complaint was timely filed from the Commission's action in sending him a "notice of right to file a civil action" letter rather than dismissing his complaint pursuant to section 21.202 of the Labor Code.

Appellant also argues that there was no evidence that it had been served with a copy of the complaint within ten days after it was filed. However, the burden of serving notice on the employer lies with the Commission, not with the complainant. TEX.LAB. CODE ANN. § 21.201(d) (Vernon 1996). Appellant refers us to no legal authority which requires the plaintiff to prove that the Commission fulfilled its duty of serving the complaint on the employer in order to establish that the plaintiff has exhausted his administrative remedies. We therefore overrule appellant's seventeenth point of error.

## Consistency Between Pleadings and Jury Issues

Appellant's fifth point of error argues that the trial court erred in submitting issues to the jury which encompassed matters not contained in the plaintiff's pleadings. A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. TEX.R.CIV.P. 47; *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). The purpose of this rule is to give the opposing party fair notice of the claims involved and information sufficient to enable him to prepare a defense. *Roark*, 633 S.W.2d at 810. For a variance to be fatal, it must be a substantial, misleading, and prejudicial departure from the pleadings. *Stone v. Lawyers Title Ins. Co.*, 554 S.W.2d 183, 186 (Tex.1977). The general rule is that pleadings are construed as favorably as possible to the pleader. *Gonzalez v. City of Harlingen*, 814 S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied). This is particularly so when no special exceptions are filed. *Roark*, 633 S.W.2d at 809.

Appellant asserts that appellee's pleadings mentioned only claims for intentional infliction of emotional distress and wrongful discharge, whereas the jury charge allowed the jury to find liability for acts of discrimination while Huerta was still on the job, rather than the narrow issue of discriminatory discharge in Huerta's pleadings. Appellee's pleadings contained specific references to discriminatory discharge and also several general references to "discrimination."[3] Although the

---

**3.** The relevant portions of plaintiff's petition read:

*FACTUAL ALLEGATIONS*

references to "discrimination" were ambiguous, it was appellant's duty to except to the ambiguities if it desired further specificity. TEX.R.CIV.P. 90, 91; *Roark,* 633 S.W.2d at 810. Construing the term "discrimination" liberally in favor of the pleader, we hold that the trial court did not abuse its discretion in submitting a question to the jury regarding multiple forms of discrimination and overrule appellant's fifth point of error.

### Discrimination for Filing Workers' Compensation Claim

■■■■■ Appellant's sixth point of error challenges the legal and factual sufficiency of the evidence supporting the jury's affirmative finding on question one. Question one asked whether Gorges had discriminated against or discharged Huerta because he had filed a workers' compensation claim or hired a lawyer to assist him with such a claim. Several factors have been recognized by other Texas courts of appeals as circumstantial evidence sufficient to establish a causal link between filing a compensation claim and subsequent termination of employment, including (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. *Continental Coffee Prods. Co. v. Cazarez,* 903 S.W.2d 70, 77 (Tex. App.—Houston [14th Dist.] 1995, *aff'd in part and rev'd in part on other grounds,* 937 S.W.2d 444 (Tex.1996));[4] *Palmer v. Miller Brewing Co.,* 852 S.W.2d 57, 61 (Tex.App.—Fort Worth 1993, writ denied); *Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.—El Paso 1989, writ denied). The worker's compensation claim need not be the sole cause of the termination. *Borden, Inc.*

> ... While in the course of his employment with GORGES FOODSERVICE, INC., plaintiff received an on the job injury. Due to the nature of these injuries defendant notified it's (sic) workmen's compensation carrier to pay for plaintiff's medical expenses. Consequently, plaintiff, Guadalupe Huerta, was diagnosed with a disability. On or about October 26, 1993, Plaintiff was terminated from his employment by the defendant corporation. Plaintiff asserts that the true reason for his termination was because of his disability and because he in good faith instituted a claim and took other protected steps under the Workers' Compensation Act. Plaintiff alleges that the conduct of the defendant constituted unlawful discrimination on the basis of plaintiff's perceived and/or real disability.
> ### WRONGFUL DISCHARGE
>
> This lawsuit has been filed to remedy the wrong done to plaintiff which arose from his exercise of his rights under the Workers' Compensation Act and Article 8307c (Tex. Labor Code, Section 451.001). For injuries he received, in the course and scope of his employment, plaintiff did, in good faith, take steps toward instituting a proceeding as well as other protected steps under the Worker's Compensation Act. Having been discriminated against, plaintiff seeks full redress for all the damages he has incurred against Defendant, Gorges Foodservice, Inc.
> ### DISABILITY
>
> The Plaintiff, GUADALUPE HUERTA, suffered from a physical disability. As such he falls within a protected class under the Texas Commission on Human Rights Act. The Defendant, GORGES FOODSERVICE, INC., is an employer with at least fifteen employees, subjecting itself to coverage under the Act. The conduct of the defendant's (sic) complained of constituted unlawful discrimination on the basis of the plaintiff's disability. Defendant, GORGES FOODSERVICE, INC., its agents, servants, and employees, permitted such discrimination to take place. Defendant, GORGES FOODSERVICE, INC., its agents, servants, and employees knew, or in the exercise of ordinary care should have known of the existence of the discriminatory conduct. As a result of defendant's unlawful conduct plaintiff has suffered the damages below.

4. The Texas Supreme Court's *Continental Coffee* opinion notes that workers' compensation-retaliatory discharge cases require proof similar to that required in Whistleblower Act cases, *see* TEX.GOV'T CODE ANN. § 554.001, et seq. (Vernon 1988), and directs courts to apply the whistleblower case *Texas Department of Human Services v. Hinds,* 904 S.W.2d 629 (Tex.1995) to both contexts. *Continental Coffee,* 937 S.W.2d at 450. However, the Supreme Court's opinion in *Continental Coffee* ultimately relied on some of the factors articulated in *Paragon, Palmer,* and the intermediate court's opinion in *Continental Coffee. See Continental Coffee,* 937 S.W.2d at 452 (evidence that employer's explanation of termination was false and that employer had negative attitude toward employee's injured condition sufficient to support retaliatory discharge finding). Therefore, we consider these factors to still be valid.

*v. Guerra,* 860 S.W.2d 515, 522 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.)

Appellee presented evidence of numerous incidents of discrimination by Gorges. He testified that, after being injured and filing a worker's compensation claim, he was reassigned to work as a parking lot security guard, where he was required to wear a yellow fireman's hat. No one else was required to wear such a hat. He was not allowed to use a nearby restroom, but was instead required to use a more distant restroom. It took him thirty minutes to make a trip to the more distant restroom and return to his post. Huerta was later warned that he could be fired if he was absent from his post for such a long time again. When Huerta was transferred to work as a security guard at a different Gorges facility, the employees there told him they had been instructed by Gorges management not to let him into the office, which prevented his access to a restroom at that facility.

When he brought a "light duty" release for work to the Gorges office, Gorges's management indicated to him that they would not discuss a light duty assignment until Huerta dismissed the lawyer he had retained to assist him. Huerta then fired his lawyer. Huerta also testified that on October 15, 1993, he brought a "full duty" release to Gorges, which gave him medical authorization for any type of work. However, on October 26, 1993, Gorges sent a letter to Huerta stating that they had no positions available for someone with Huerta's medical restrictions and that he "would be at risk working at Gorges."

Gorges disputes many of the facts stated above. They contend that the hat Huerta was required to wear was an ordinary hard hat, not a fireman's hat, and that all workers on light duty were required to wear the hats so they could be identified and not called on to perform strenuous tasks. Gorges denied ever restricting Huerta's access to a restroom, and Gorges's personnel manager testified that, when the October 26, 1993 letter was sent, no one in Gorges management had yet seen Huerta's full duty release. They also argue that the October 26, 1993 letter did not terminate Huerta, and that, upon discovering Huerta's full duty release, they took steps to bring him back to work. Gorges also relies on a response it wrote on December 9, 1993 to a claim by Huerta for unemployment benefits, which listed his period of employment as "2/16/87 through currently." However, the jury was the sole evaluator of the witnesses' credibility and entitled to resolve conflicts in the testimony as they saw fit. *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Salazar v. Hill,* 551 S.W.2d 518, 520 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

█ The October 26, 1993 letter provided ample evidence of Huerta's termination. The letter's references to the lack of any "permanent" light duty positions, and that Huerta "would be at risk working at Gorges" indicate that Gorges did not expect to ever bring Huerta back to work. The statement to the Texas Employment Commission that Huerta was currently employed was self-serving, since Gorges's unemployment tax rates are contingent on the number of Gorges employees receiving unemployment benefits, and the statement could have been discounted by the jury as not credible. Similarly, the jury could have chosen to believe Huerta, who testified that Buford never called to tell him to report back to work, rather than Buford, who testified that she did.

Huerta provided ample evidence of discrimination against him while he was still working at Gorges. He testified about humiliations he was made to endure that no other Gorges employees were subjected to. Gorges had also decided not to offer him any more light duty posts and to not bring him back to work until he had a full duty release. The jury was free to disbelieve Buford's explanation that this action was taken only to prevent further injury to Huerta.

Huerta also presented ample evidence that the discrimination he suffered resulted from his claim for workers' compensation. Gorges had knowledge of Huerta's claim for workers' compensation benefits. The discrimination Huerta suffered on the job after his injury evidences a negative attitude toward his injury and discriminatory treatment in comparison to other Gorges workers. Gorges violat-

ed company policies by refusing to continue offering Huerta light duty assignments and by not properly documenting his "medical leave of absence." Finally, the refusal of Gorges management to speak with Huerta regarding accommodating his medical limitations until he fired his lawyer provided some evidence that the discrimination resulted from Huerta obtaining legal counsel. We conclude that Huerta provided legally and factually sufficient evidence to support the jury's finding on question one and overrule appellant's sixth point of error.

### Discrimination on Basis of Disability

■ Appellant's seventh point challenges the sufficiency of the evidence supporting the jury's finding that Huerta had a disability. "Disability" means a mental or physical impairment that substantially limits at least one major life activity, or being regarded as having such an impairment. TEX.LAB.CODE ANN. § 21.002(6) (Vernon 1996). The jury was presented with a definition that matched the statutory definition. Appellant argues only that there was no evidence that Huerta suffered from an impairment that substantially limited a major life activity. Appellant does not address the issue of whether there was sufficient evidence that Huerta was *regarded* as having an impairment that substantially limited a major life activity. Therefore appellant has waived his right to complain about this finding. *See Greater Houston Transp. Co., Inc. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.—Corpus Christi 1993, writ denied) (where attack on multi-element damages award fails to address each element of award, challenge is waived). We overrule appellant's seventh point of error.

■ Appellant next challenges the legal and factual sufficiency of the evidence supporting the jury's answer to question three, which asked whether Huerta was discharged or discriminated against because of his disability (actual or perceived). In the only cases directly on point, federal courts apply-

ing Texas law have held that the plaintiff has the burden of proving that the decision to terminate was based *solely* on the disability. *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 357–58 (N.D.Tex.1994); *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1345 (S.D.Tex.1987). This rule differs from the rule that has developed when termination is alleged to be caused by the filing of a workers' compensation claim, where the plaintiff need not show that the filing of the claim was the sole cause of the termination. *Borden,* 860 S.W.2d at 522. This rule also appears to be contrary to the opinion of the Texas Supreme Court in *Department of Human Services v. Hinds,* 904 S.W.2d 629, 635 (Tex. 1995) where the Texas Supreme Court expressed dissatisfaction with a causation standard in employment discrimination cases which would require the illegal grounds to be the "principal" reason for the termination. *Hinds* concluded that the standard of causation in whistleblower and similar cases should be that, without the protected conduct of the employee, the employer's alleged discriminatory conduct would not have occurred when it did. *Hinds,* 904 S.W.2d at 636. The test enunciated in *Hinds* does not require that the protected conduct of the employee be the *sole* cause of the discrimination. Therefore, we will apply the standard enunciated in *Hinds* and not require that Huerta's disability be the sole cause of his termination.[5]

In arguing this point, appellant relies on his argument that appellee was not actually terminated by the October 26, 1993 letter. Appellant does not argue that, if Huerta was fired on October 26, 1993, it was not because of a perceived disability. Since we have already determined that ample evidence supported an implied finding that the October 26, 1993 letter did terminate Huerta, we overrule this point of error.

■ Next, appellant argues that there is legally and factually insufficient evidence to

**5.** We note also that a "sole cause" test could work injustice in cases such as this one. Huerta alleged that he was terminated both because of his disability and because he had filed a workers' compensation claim. Under a "sole cause" test, if Gorges had indeed terminated Huerta for both

reasons, then Huerta would lose on his disability cause of action, since his disability would not be the sole cause of his termination. In this way, a "sole cause" test would permit an employer that illegally discriminates in multiple ways to benefit from its misdeeds.

support the jury's finding in response to question four that Gorges failed to reasonably accommodate Huerta. The record reflects that the parties agreed to submit this issue to the jury without a definition of the phrase "reasonably accommodate," although the record does not reflect the reason for this agreement. If Gorges had made a reasonable effort to accommodate Huerta, then he would not be permitted to recover for discrimination based on disability. *Austin State Hosp. v. Kitchen,* 903 S.W.2d 83, 89 (Tex. App.—Austin 1995, no writ); *see also Chiari v. City of League City,* 920 F.2d 311, 319 (5th Cir.1991).

Gorges argues that it tried four different light duty assignments for Huerta, and he was unable to perform any of them. The parties agree that Huerta was moved from the first two light duty posts, in the box room and in the kitchen, because these jobs aggravated his medical condition. The record reflects that Huerta needed repeated doctor's visits and repeated breaks from work of a few weeks at a time for medical reasons.[6] However, when questioned about these injuries, Huerta asserted that they resulted from Gorges's refusal to respect his light duty status. He explained "it was not really light duty because they put me to do heavy stuff." The parties presented different versions of why the other two posts, in the parking lot and at the freezer plant, did not work out. Huerta testified that he had difficulties at the parking lot because Gorges denied him access to a restroom, which Gorges denies. Gorges representatives testified that Huerta refused the night job at the freezer plant because his children would not let him sleep during the day. Huerta acknowledges discussing his difficulty adjusting to working at night with Gorges, but said that when he was told the night job at the freezer plant was the only job available, he accepted the post. As we noted earlier, the jury was the sole evaluator of the witnesses' credibility and was entitled to resolve conflicts in the testimony as it saw fit. *Silcott,* 721 S.W.2d at 293; *Salazar,* 551 S.W.2d at 520. Furthermore, Gorges's policy regarding light duty assignments indicates that Gorges had two

other light duty positions, monitoring the production line and packaging gloves and hairnets, which were never offered to Huerta. We hold that there was legally and factually sufficient evidence presented for the jury to find that Gorges failed to reasonably accommodate Huerta. Appellant's ninth point of error is overruled.

### Intentional Infliction of Emotional Distress

Appellant's next point of error alleges legally and factually insufficient evidence to support the jury's affirmative finding on appellee's claim for intentional infliction of emotional distress. To recover under this tort, the plaintiff must prove that (1) the defendant acted intentionally or recklessly, (2) the conduct was "extreme and outrageous," (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it is tortious. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *Benavides v. Moore,* 848 S.W.2d 190, 195 (Tex. App.—Corpus Christi 1992, writ denied). Any party seeking recovery for mental anguish, even when advancing a cause of action that does not require the "severe" damages required for intentional infliction of emotional distress, must prove more than "mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). However, proof of a physical manifestation of the emotional distress is not required. *Krishnan v. Sepulveda,* 916 S.W.2d 478, 491 n. 3 (Tex.1995).

Huerta did not present evidence of emotional distress that went beyond worry, anxiety, vexation, embarrassment, and anger, and was so severe that no reasonable person could be expected to endure it without unreasonable suffering. Huerta points to his testi-

---

**6.** The record reflects eleven instances between March 1992 and September 1992 when Huerta

was advised by doctors to rest from his work for periods of a few days up to two weeks.

mony that his wife ejected him from the house because he was without a job, and that even after she took him back he and his wife rarely spoke, and he was only there for the sake of his children. He no longer took his children on outings such as going to the beach. He also said that he was unable to concentrate as he had before he lost his job, and felt insecure about his prospects for finding future employment. He was also embarrassed about the low salary he was forced to accept after leaving Gorges.[7] While one may assume that Huerta suffered some degree of emotional distress as a result of his marital separation, he did not present any evidence establishing the severity of his distress. Similarly, the testimony that he no longer took his children on outings provides circumstantial evidence of some emotional distress, but does not necessarily indicate severe emotional distress. Finally, difficulty with concentration and feelings of insecurity and embarrassment are exactly the kinds of relatively minor emotional distress that the term "severe" is meant to filter out and render non-compensable under this tort. We hold that appellee's evidence of severe emotional distress was legally insufficient and sustain appellant's tenth point of error.

### Future Earning Capacity

Appellant's eleventh and twelfth points of error contest the damages awarded to appellee. First, appellant argues that appellee should not have been permitted to recover any damages for lost future wages since he refused an offer of re-employment from Gorges. A wrongfully discharged employee has a duty to mitigate damages by making a good faith effort to obtain and retain employment. *Ford Motor Co. v. Equal Employment Opportunity Comm'n*, 458 U.S. 219, 231–34, 102 S.Ct. 3057, 3065–67, 73 L.Ed.2d 721 (1982);[8] *Gulf Consol. Int'l Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex.1983) (opin. on rehearing). Mitigation is a defensive issue upon which Gorges bore the burden of proof at trial. *Id.* Rejection of a job offer from the former employer alone, however, does not conclusively show failure to mitigate. *Azar Nut Co. v. Caille*, 720 S.W.2d 685, 687–88 (Tex.App.—El Paso 1986), *aff'd*, 734 S.W.2d 667 (Tex.1987). Generally, the reasonableness of plaintiff's explanation for rejecting a job offer, and the adequacy of efforts to mitigate, are fact questions properly left to the jury. *Id.*; *Pacesetter Corp. v. Barrickman*, 885 S.W.2d 256, 263 (Tex.App.—Tyler 1994, no writ).

The only evidence presented to the jury of an offer of re-employment came from the testimony of Stacy Buford, who testified that she phoned Huerta after seeing his full duty release in December 1993 to ask him to come back to work, which Buford said he happily agreed to do. Huerta denied receiving any phone calls from Gorges asking him to come back to work. Presented with this conflict, the jury was free to choose to believe Huerta's testimony that he was never offered re-employment. *Silcott*, 721 S.W.2d at 293.

Appellant also contends that the jury disregarded Huerta's own testimony regarding his present and future earning capacity by implicitly finding that he had no future earning capacity. Huerta testified that his annual salary with Gorges was ap-

---

**7.** The record provides some indication that Huerta had an emotional response when testifying about his life since leaving Gorges. The following exchange was part of Huerta' testimony:

> HENLEY (Huerta's attorney): Why does it bother you to talk about your salary now?
> HEURTA: It's embarrassing. I'm a U.S. citizen and I make less than minimum wage.
> HENLEY: Take a deep breath.
> HUERTA: It's embarrassing making less than minimum wage.

Henley's question about Huerta being "bothered" by talking about his low wage and her instruction to "take a deep breath" indicate that Huerta was visibly upset by this topic. Shortly thereafter, while Huerta was testifying about how his wife had told him to leave the house "because she didn't want nobody (sic) that could not get a job," Henley again interrupted her questioning to ask Huerta "you okay, Lupe?" However, witnesses are frequently emotionally affected by testifying in court, and we are unable to find anything in these incidents that rises to the level of severe emotional distress.

**8.** Federal cases decided under Title VII of the Civil Rights Act of 1964 provide useful guidance to cases brought under Chapter 21 of the Texas Labor Code, which is analogous to Title VII. *Borg-Warner Protective Servs. Corp. v. Flores*, 955 S.W.2d 861 at 870 (Tex.App.—Corpus Christi 1997, n.w.h.).

proximately $10,000. However, more precise documentary evidence submitted by Gorges indicated that his actual salary for 1991, the last full year he worked for Gorges was $8947.49. He also testified that he was forty-five years old and intended to work until he was sixty-six, meaning another twenty-one years.

Huerta testified that he had held two jobs since leaving Gorges, delivering newspapers and driving a taxi. He had also mentioned three other places by name where he had sought employment, and said that he had also sought employment at "some other places that I don't recall right now." Regarding the newspaper job, Huerta testified that he stopped doing this job because he was unable to concentrate after leaving Gorges, and that lapses in concentration caused him to miss several houses. The newspaper cut his pay for houses that he missed. In light of Huerta's explanation for stopping the newspaper job and the fact that he drove his taxi fifty hours a week, we hold that the jury had sufficient evidence to permit it to refuse to consider any possible earnings from the newspaper job in calculating his future earnings.

■ The jury's decision to disregard his earnings from the taxi job, however, is more problematic. Huerta testified that his wages driving the taxi were $2.30 per hour, and that he never received tips.[9] Huerta's actual reported income from 1994, the date of his last tax return available at the time of the trial, was $5488.45.

■ The amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the discretion of the jury. *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943). Where the plaintiff's earning capacity is not totally destroyed, the extent of the loss can best be shown by comparing the plaintiff's actual earnings before and after the injury. *Id.;*

*Amoco Prod. Co., Inc. v. Thompson,* 657 S.W.2d 824, 832 (Tex.App.—Corpus Christi 1983, rev'd on other grounds, 662 S.W.2d 951).

The jury awarded Huerta $210,000 for future wages, apparently taking his $10,000 estimate of his annual salary and multiplying that figure by the twenty-one years he intended to continue working, without discounting this amount by any future wages it expected Huerta to earn elsewhere. Had the jury compared Huerta's actual earnings before and after the injury, they would have compared his pre-injury annual salary of $8947.49 and a post-injury annual salary of $5488.45 and arrived at difference of $3459.04. Multiplied by twenty one years, Huerta's total lost earnings would have been $72,639.84, which is $137,360.16 less than what the jury awarded. There was no basis in the evidence for the jury to disregard the undisputed evidence that Huerta was working as a taxi driver at the time of trial, and that his last reported annual wages were $5488.45. Therefore we suggest a remittitur of $137,360.16.

## Backpay

■ Appellant next challenges the damages finding on the issue of backpay. Appellee's annual wages during his last full year at Gorges were $8947.49, or approximately $750 per month. Appellant argues that the starting date for calculating Huerta's backpay should be October 1992, when he took a light duty release to Gorges and they refused to put him back to work. Since the trial was held on January 31, 1996, appellee contends that forty months of lost wages from Gorges should have been considered in his award for past lost wages. Appellant argues that backpay should not be awarded for any time after January 3, 1994, because that was the date Buford instructed him to return to work. However, we have already discussed how the jury was free to disregard Buford's testimo-

---

9. Appellant notes that Huerta had said in a response to an interrogatory that he did sometimes receive tips, but that he could not remember any amounts. Gorges did not present any evidence establishing the amount of any tips Huerta may have received. The discrepancy between Huerta's response to the interrogatory and his testi-

mony at trial went only to his credibility as a witness, which was a matter solely for the jury. *Gray v. Floyd,* 783 S.W.2d 214, 217 (Tex.App.—Houston [1st Dist.] 1990, no writ); *Ryan v. Morgan Spear Assocs., Inc.,* 546 S.W.2d 678, 685 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

ny and instead believe Huerta's testimony that no one from Gorges ever called to tell him to return to work. Therefore, the jury had sufficient evidence to permit it to calculate a backpay award up to the date of the trial, January 31, 1996.

There was also sufficient evidence to justify using October 1992 as the starting date for the award of backpay. Although Gorges had already placed Huerta in four different light duty posts when it refused him light duty in October 1992, Huerta presented evidence that Gorges itself was to blame for the problems Huerta experienced as a parking lot attendant, and Huerta testified that, although he had complained about the job of night security guard, he was willing to accept that position if Gorges had no other positions available. Gorges had two other light duty positions, monitoring the production line and packaging gloves and hairnets, which were never offered to Huerta.

■ Calculating monthly wages of $750 multiplied by the forty months from October 1992 to the end of January 1996 shows that Huerta would have made $30,000 during that period if he had kept his job with Gorges. However, after leaving Gorges, Huerta began working as a taxi driver and delivering newspapers. His tax returns indicate that he made $727.95 in 1993 and $5488.45 in 1994 as a taxi driver, for a total of $6216.40 for those two years. There was no specific evidence of his income as a taxi driver in 1995 or January 1996. He did testify that he made $2.30 per hour, worked fifty hours a week, and received no tips. If he worked all fifty two weeks of the year at his pace of fifty hours per week, his $2.30 per hour wage would result in an annual wage of $5980. Therefore, his income as a taxi driver from January 1995 through January 1996 was approximately $6250,[10] and his total income from driving a taxi up to the date of the trial was approximately $12,500.

Huerta also worked delivering newspapers, although he did not report any of this income on his taxes. In addition to delivering the newspaper, carriers were required to collect for the newspaper from their customers. Huerta testified that his gross income from delivering the papers was $250 per month, but that he spent $100 each month on gas, $20 on plastic wrappers for the papers and $30 on fines for missing houses,[11] leaving a net income from delivering the newspapers of $100 month.

The newspaper's district manager, Diana Candanoza, testified that Huerta had approximately 194 customers, and that his wage would have been $2 per customer. Carriers were also offered a bonus of $0.50, rising to $0.75 in October 1994, for each customer from whom they collected and paid the newspaper in a timely fashion. This would have enabled Huerta to have a maximum gross income of $485 under the $0.50 bonus or $533.50 after the $0.75 bonus became effective. Candanoza also testified that the newspaper charged $9 for a box containing approximately 2000 plastic wrappers and $0.65 for a box of 2000 rubber bands. The newspaper also charged if they had to deliver the route for the carrier, and, if a carrier missed more than six houses, the carrier was fined one dollar for each additional missed house. She estimated that Huerta would have to drive a maximum of five miles to pick up his papers, do his route, and return home. She also testified that carriers sometimes had trouble with customers not paying, in which case the carrier would be responsible for paying the customer's bill for the papers that had been delivered. She also testified that only Huerta himself would be able to say precisely what his net income was from delivering newspapers.

While Candanoza's testimony suggests that Huerta should have been able to earn more than a net income of $100 per month delivering newspapers, she herself acknowl-

---

**10.** Extrapolating the $5980 per year wage estimate derived from his hourly wage produces a thirteen month wage of $6478.33. Extrapolating the $5488.45 reported on Huerta's 1994 tax return produces a thirteen month wage of $5945.82. $6250 is a rough average of these figures.

**11.** Huerta testified that the insecurity he felt as a result of losing his job with Gorges distracted him and caused him to miss houses.

edged that only Huerta would know how much he actually made. The jury, therefore, could have chosen to accept Huerta's first-hand testimony that he made a net income of $100 per month. Both parties agree that Huerta began delivering newspapers in November 1993 and quit sometime before trial. There is no evidence of exactly when he quit.

The jury awarded Huerta $35,500 in backpay. Appellee has remitted $20,637.80, leaving an award of $15,137.80. We have calculated that the evidence showed approximately $30,000 in wages Huerta would have earned if he had stayed at Gorges, from which his wages of approximately $12,500 driving the taxi from 1993 through the date of trial should be subtracted, leaving a sum of $17,500. From this figure, some amount of money should also be subtracted to reflect Huerta's $100 per month net wages delivering the newspaper, although it is difficult to quantify this amount since no evidence establishes when Huerta quit delivering newspapers. The difference between the $17,500 figure and the $15,137.80 figure the plaintiff retains after the remittitur is approximately $2400, which would cover two years wages delivering the newspaper. An appellate court should be reluctant to disturb a personal injury damages award, particularly when a substantial remittitur has been made. *Baptist Memorial Hosp. Sys. v. Smith,* 822 S.W.2d 67, 79 (Tex.App.—San Antonio 1991, writ denied). In light of the remittitur appellee has made, we decline to disturb the backpay award.

### Mental Anguish

Appellant next complains about the damages award for past mental anguish. The jury awarded Huerta $150,000 for past mental anguish. Appellant's argument is confined to the "severe emotional distress" standard applicable to a claim for intentional infliction of emotional distress. However, appellee was also entitled to seek ordinary mental anguish damages on his claim for discrimination based on filing a claim for workers' compensation, TEX.LAB.CODE ANN. § 451.002 (Vernon 1996), *Borden, Inc. v. De La Rosa,* 825 S.W.2d 710, 719 (Tex.App.—Corpus Christi 1991, *vacated,* 831 S.W.2d 304

(Tex.1992)); and discrimination based on disability, TEX.LAB.CODE ANN. § 21.2585 (Vernon 1996), *see also Mayberry v. Texas Department of Agriculture,* 948 S.W.2d 312, 314 (Tex.App.—Austin 1997, writ denied) (section 21.2585 allows recovery of compensatory damages, including mental anguish, for claims filed with TCHR on or after September 1, 1993). We have already addressed appellant's argument under its tenth point of error that the evidence was insufficient to establish severe emotional distress and have sustained that point. However, because appellant has not addressed the propriety of appellee's recovery for mental anguish, we will not disturb that award. TEX.R.APP.P. 74; *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983).

### Prejudgment Interest

Appellant also challenges the trial court's award of prejudgment interest on the damages for lost wages in the future. Generally prejudgment interest is not allowed on future damages. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 555 (Tex.1985). This is because future damages have not yet accrued at the time of trial, so no prejudgment interest is necessary to make the plaintiff whole. *Id.* at 556. However, there is a statutory exception that allows recovery of prejudgment interest on judgments in wrongful death, personal injury, and property damage cases. TEX.REV. CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1997); *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 325 (Tex.1994). We must decide whether appellee's recovery for lost wages in the future meets the statutory exception.

We conclude that it does not. The loss of wages in the future is a purely economic loss. *Gifford Hill American, Inc. v. Whittington,* 899 S.W.2d 760, 766 (Tex. App.—Amarillo 1995, no writ). Economic loss is not "property damage" as contemplated by article 5069–1.05. *Dunn v. Menassen,* 913 S.W.2d 621, 626 (Tex.App.—Corpus Christi 1995, writ denied). Likewise, economic loss is distinct from "personal injury." *Gifford Hill,* 899 S.W.2d at 766. Obviously wrongful death is not present in this case.

Therefore, this case does not fall into any of the categories enumerated in the statute where prejudgment interest is always allowed, even on damages that have not yet accrued. *See C & H Nationwide*, 903 S.W.2d at 324–25 (for wrongful death, property damage, and personal injury cases, article 5069–1.05 "manipulates concept of prejudgment interest" in a way that "sacrifices purity of meaning" in order to modify parties' behavior to encourage settlement).

■ Our opinion on this point is consistent with that of the Amarillo Court of Appeals in *Gifford Hill*, 899 S.W.2d at 766, and also the opinion of the Tyler Court of Appeals in *Pacesetter*, 885 S.W.2d at 263. Our opinion is contrary to that of the El Paso Court of Appeals in *Acme Boot Co., Inc. v. Montenegro*, 862 S.W.2d 806, 811 (Tex. App.—El Paso 1993, no writ). *Acme Boot* held that as the scope of damages recoverable for employment discrimination was not limited to economic damages, damages recoverable for wrongful discharge under the Texas Workers' Compensation Act were personal injury damages within the meaning of article 5069–1.05. *Acme Boot*, 862 S.W.2d at 811. While we agree with *Acme Boot* that a greater scope of damages is permitted in employment discrimination cases than just economic damages, we hold that, when the accrued damages are separated from non-accrued damages such as future lost wages, no recovery of prejudgment interest should be allowed on the future economic damages. *Cavnar*, 696 S.W.2d at 556.

### Attorney's Fees

■ Appellant's final complaints regarding damages focus on the award of attorney's fees. Appellant argues that the trial judge erred in making a finding on attorney's fees by himself, since attorney's fees is an issue that must be submitted to a jury. However, when a claim is made based on employment discrimination under the Texas Commission on Human Rights Act, attorney's fees are awarded as part of the costs. Tex.Lab.Code Ann. § 21.259(a) (Vernon 1996). The trial court is the proper authority to determine and award costs, including attorney's fees authorized as costs under Chapter 21 of the Texas Labor Code. *Borg–Warner Protective Services Corp. v. Flores*, 955 S.W.2d 861, 870 (Tex.App.—Corpus Christi 1997).

■ Appellant next complains that the attorney's fee award was far beyond the fees established by the evidence, and "can only be attributed to the plaintiff's request that attorney's fees be increased by some type of lodestar multiplier." Appellant then argues that a lodestar multiplier is not authorized under any relevant law. We recently upheld the use of the lodestar method in employment discrimination cases in *Borg–Warner v. Flores*, and similarly uphold its use in this case. *Borg–Warner*, 955 S.W.2d 861 at 870.

Finally, appellant notes that although appellee premised his attorney's fee evidence on the need to hire attorney David Jones to handle the appeal, appellee represented to this Court in a motion for extension of time to file appellate brief that Jones would not be handling this appeal. However, despite the statement in the motion for extension of time, appellee's brief indicates that it was prepared by David Jones. Therefore, we see no error in considering Jones's services in calculating attorney's fees.

### Other Limitations on Damages

■ Appellant's thirteenth point of error argues that the plaintiff's damages should be limited by section 21.2585 of the Texas Labor Code. Point fourteen asserts that punitive damages are not available under the Texas Commission on Human Rights Act. Neither of these points is supported by any argument. Therefore, appellant has waived these two points of error. Tex.R.App.P. 74.

### Exemplary Damages

■ Appellant's fifteenth and sixteenth points of error challenge the evidence supporting the jury's findings on exemplary damages. Ordinarily a plaintiff must prove fraud, malice, or gross negligence in order to recover exemplary damages. Act of June 16, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex.Gen.Laws 87, *amended by* Act of April 20, 1995, 74th Leg., R.S. ch. 19, § 1, 1995

Tex.Sess.Law Serv. 110;[12] *Villarreal v. Elizondo,* 831 S.W.2d 474, 478 (Tex.App.—Corpus Christi 1992, no writ). In this case, the jury was asked in question seven whether Gorges's wrongful acts "were committed willfully or maliciously." Malice was defined as "an intentional wrongful act done without just cause or excuse before one believes it to be right or legal or done with conscious disregard for the rights of others." Malice may be either actual or implied. *Continental Coffee,* 937 S.W.2d at 452. Actual malice is characterized by "ill-will, spite, evil motive, or purposing the injuring of another." *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex. 1969). Implied or legal malice, on the other hand, exists when wrongful conduct is intentional and without just cause or excuse. *Continental Coffee,* 937 S.W.2d at 452.

Sufficient evidence was presented to show that Gorges's wrongful acts of discrimination against Huerta were done intentionally, characterized by ill-will and spite, and done without just cause or excuse. Although Gorges argues that they tried to accommodate Huerta in a variety of light duty assignments before determining that he was not fit for light duty, Huerta presented evidence that Gorges itself was to blame for the failure of the light duty assignments. Gorges's actions in denying Huerta access to a restroom on two of those assignments indicates ill-will and spite. Further evidence of ill-will and spite is provided by Huerta's recounting of the incident when he went to Gorges's office to discuss returning to work and no one would speak with him until he fired the lawyer he had obtained to assist him with his workers' compensation claim. After Huerta brought a full duty release to Gorges which removed any just cause or excuse Gorges had for continuing to limit Huerta's employment in any way, Gorges wrote him the October 26, 1993 letter that we have held provided ample evidence of Huerta's termination. We hold that legally and factually sufficient evidence was presented to show that Gorges's wrong-

ful actions were done with malice and we overrule appellant's fifteenth point of error.

 Appellant also challenges the amount of exemplary damages awarded by the jury, $500,000. Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981). A court of appeals confronted with a challenge to the factual sufficiency of an exemplary damages award must detail the relevant evidence explaining why the evidence supports or does not support the award in light of the *Kraus* factors. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994).

The evidence regarding the nature of the wrong and the character of the conduct involved have already been thoroughly discussed. Huerta presented evidence that Gorges undermined and humiliated his efforts to return to work on light duty, refused to honor later light duty requests, insisted that he distance himself from legal counsel, and when he produced a release to return to work on full duty, they fired him. Culpability for these actions can lie nowhere but with Gorges and its agents. Regarding the situation and sensibilities of the parties concerned, Gorges was a corporation with a net worth of approximately ten million dollars, whereas Huerta was a father of six who had never earned more than $9000 in a year. Huerta testified that no one wanted to give him a job because of his record with Gorges. On the last factor, we are especially reluctant to substitute our sense of "a public sense of justice and propriety" for that of a jury of citizens drawn from a cross section of the community. We will say only that the facts

12. This amendment eliminated "gross negligence" as a general ground for exemplary damages and inserted language allowing exemplary damages for a "willful act or omission or gross neglect in wrongful death actions...." Act of April 20, 1995, 74th Leg., R.S. ch. 19, § 1, 1995 Tex. Sess, Law Serv. 110, now codified at Tex.Civ.

Prac. & Rem.Code Ann. § 41.003 (Vernon Supp. 1997). The new law applies to a cause of action that accrues on or after September 1, 1995. Act of April 20, 1995, 74th Leg., R.S. ch. 19, § 2, 1995 Tex.Sess. Law Serv. 113. The cause of action in this case accrued prior to that date, hence the old standard applies.

of this case could be substantially offensive to a public sense of justice and propriety. We conclude that an exemplary damages award of $500,000 was not so against the great weight and preponderance of the evidence as to be manifestly unjust, and was supported by more than a scintilla of evidence. We overrule appellant's sixteenth point of error.

### Exclusion of Evidence

■ Finally we consider appellant's challenges regarding the trial court's exclusion of evidence. The admission and exclusion of evidence is a matter for the discretion of the trial court. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). The excluded evidence consisted of two letters, one dated December 29, 1993 from Gorges president Matt Gorges to Huerta's attorney, Aaron Peña, and another from Stacy Buford to Huerta himself, dated January 17, 1994. Also excluded was testimony from Buford and Matt Gorges about sending the letters, and testimony regarding phone conversations between Peña and two attorneys who were working on a purchase of Gorges Foodservice by Tyson Foods around the time Huerta's lawsuit was filed.

■ Appellee maintains that appellant failed to perfect its bill of exceptions by asking for a ruling during the evidentiary period of the trial. Appellee relies on *Estate of Veale v. Teledyne Industries, Inc.*, 899 S.W.2d 239, 242 (Tex.App.—Houston [14th Dist.] 1995, writ denied), which held that to preserve error in the exclusion of evidence, a party must (1) attempt to introduce the evidence during the evidentiary portion of the trial, (2) if an objection is lodged, specify the purpose for which it is offered and give the trial judge reasons why the evidence is admissible, (3) obtain a ruling, (4) make a record through a bill of exceptions of the precise evidence the party desires admitted. In *Veale*, the court held that error had not been preserved, explaining:

> Except for three very minor portions of testimony, there is nothing in the appellate record showing that appellants attempted to introduce any of the testimony they complain was excluded until after all testimony had been presented and the parties

had closed. There also is nothing in the record showing that the trial judge knew what testimony appellants wanted to introduce until after both sides had closed subject to the bill of exceptions. Further, there is nothing in the record showing that appellants ever told the trial judge precisely why the evidence was admissible until they filed their Motion for New Trial. Finally, there is nothing in the record showing that a specific ruling to exclude the evidence was ever made, although we assume from the comments made by the lawyers at oral submission to this Court that the trial judge probably made a ruling concerning the evidence at some point before the trial.

*Estate of Veale*, 899 S.W.2d at 243.

In this case, the court, after hearing argument from the parties on the record, granted appellee's motion in limine excluding the December 29, 1993 letter from Matt Gorges to Huerta's attorney and the January 17, 1994 letter from Buford to Huerta. The two letters were examined by the trial judge at this time. Appellant explained to the court its theory that the letters should be admitted because they did not impose any conditions on the job offer being made to Huerta. The trial court nevertheless granted the motion in limine. While it is true that an adverse ruling on a motion in limine does not, by itself, preserve error in the exclusion of evidence, *Chavis v. Director, State Worker's Compensation Division*, 924 S.W.2d 439, 446, (Tex.App.—Beaumont 1996, writ denied), the record in this case does reflect that appellant apprised the judge of the evidence it wanted admitted and the reasons appellant felt it should be admitted.

Later, just before appellant began its case in chief, appellee raised a question regarding whether appellant's first scheduled witness, Curtis Bonner, would be testifying about the letters which had been excluded by the limine ruling. Before ruling on the admissibility of Bonner's testimony, the trial court asked appellant to present a bill so he could "check to see where you are coming from." Appellant also presented the testimony of Edward Mann in a bill of exceptions at that time. After further argument by counsel,

the trial court announced that the testimony of those two witnesses would also be "limined." Appellant then said "my request to introduce that testimony is denied; is that correct?" to which the judge replied "That's correct." The jury was then brought in and appellant began calling its witnesses.

After appellant had presented all of its witnesses, but before appellant had closed its case, the judge told the jury "I need to hear something outside of your presence. It slipped my mind...." The judge then told appellant "I need to allow you an opportunity to make your motions." Appellant reminded the judge that it also had a bill of exceptions to make, and then proceeded to offer the letters through a bill of exceptions. At the close of the bills, appellant asked the judge for a ruling and the judge answered that he was excluding the evidence and reminded appellant of his limine rulings.

We hold that appellant preserved error on its challenge to the exclusion of this evidence. It made the trial court aware of both the content of the letters and the precise testimony to be offered by both Bonner and Mann well before concluding its case, it explained repeatedly why it felt the evidence should be admitted, and it obtained adverse rulings in all instances. Nothing more is required. *Estate of Veale*, 899 S.W.2d at 243.

▮ The substance of these communications was that Gorges considered Huerta to still be an employee, and that he should return to work. In some, but not all, of the communications, Gorges also expressed the expectation that Huerta's return to work would dispel any need for a lawsuit. The December 29, 1993 letter mentioned receiving service of Huerta's lawsuit against Gorges and stated "it is our preference that this letter can clarify the status of Mr. Huerta's employment and *avoid litigation*." (Emphasis added). The letter goes on to explain the basis for Gorges's statements in the October 26, 1993 letter regarding Huerta's inability to work at Gorges, and then describing how Huerta's full duty release had eventually come to Gorges's attention and telling Huerta to report back to work on January 3, 1994. The January 17, 1994 letter made no reference to litigation, and reiterated Gorges's position that Huerta was still employed and should have returned to work on January 3. This letter gave him until January 31 to report back to work before he would be terminated for failure to report to work.

Edward Mann, one of the lawyers who spoke with Huerta's attorney while the purchase of Gorges was being negotiated, testified that he "told Aaron Peña that his client, I forget his name, had a job; to go back to work. What was the need for a lawsuit?" However, Mann testified in a bill of exceptions that dropping the lawsuit was not a condition of Huerta's re-employment, and that there were no other conditions imposed on the job offered to him. Curtis Bonner testified in a bill of exceptions that he also participated in the phone call described by Mann, and that no conditions were imposed on Huerta returning to work with Gorges.

Appellee argues that this evidence was properly excluded as offers of settlement under Texas Rule of Civil Evidence 408. Appellant counters that offers of re-employment can only be excluded as settlement offers if some condition is attached to the offer, such as requiring the employee to drop the lawsuit in order to reclaim the job. Appellant maintains that these communications were unconditional offers of employment.

▮ The test for whether a job offer should be excluded from evidence on the ground that it is really a settlement offer is whether some concession is being made by a party to avoid litigation. *Tatum v. Progressive Polymers, Inc.*, 881 S.W.2d 835, 837 (Tex.App.—Tyler 1994, no writ). In this case, Huerta was not required to make any concession in order to return to his old job. Although Gorges appears to have hoped that Huerta would choose not to proceed with his lawsuit after he resumed employment with Gorges, nothing in the excluded evidence would prohibit Huerta from going ahead with his lawsuit alleging that he had been wrongfully terminated from the period of October 26, 1993 up until the time his job was re-offered to him in late December of that year. We conclude that the trial court erred in excluding the two letters and the testimony of Bonner and Mann.

### Whether the Error is Reversible

Our next task is to consider whether the error is reversible. For the erroneous exclusion of evidence to be reversible, it must be shown that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex.1992). A successful challenge to evidentiary rulings usually requires that the complaining party show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex.1995). We conduct our review to determine whether the error was reversible by examining the entire record, focusing on how the evidence erroneously admitted or excluded would have influenced the trier of fact. *Id.* at 755.

Appellant contends that, without the excluded evidence, the only evidence it had of offers of re-employment was Buford's testimony that she called Huerta and asked him to come back to work. However, Huerta contradicted this testimony. If the letters and the testimony of Bonner and Mann had been admitted, Gorges would have had uncontroverted evidence of repeated attempts to bring Huerta back to work.

One claiming to be the victim of employment discrimination has the duty to mitigate damages by accepting an unconditional offer of the job originally sought, or else the claimant loses any right to recover lost wages for the time following the offer. *Ford v. Equal Employment Opportunity Comm'n*, 458 U.S. at 231–34, 102 S.Ct. at 3065–67. However, where the sincerity of the job offer is questionable, the offer may be rejected without breaching the duty to mitigate damages. *Azar Nut Co.*, 720 S.W.2d at 688. Therefore, the issue before us is, if the jury had before it uncontroverted evidence of offers of re-employment, would they have found that Huerta's refusal of the job offers was a failure to mitigate damages, or would they have found that the offer was insincere and Huerta was justified in rejecting it?

We hold that, in light of the jury's resolution of various issues in this case regarding Gorges's good or bad faith toward Huerta, the jury would have found that the offers of re-employment were insincere and Huerta was justified in rejecting them. Gorges tried to convince the jury that they had tried Huerta in four different light duty assignments before concluding that light duty was only hurting Huerta and that, for his own good, they should refuse to offer him any more assignments until he had a full duty release. They also tried to convince the jury that Huerta's full duty release had been misplaced, and that they offered Huerta his old job back as soon as practical after discovering his full duty status. The jury found instead that Gorges had failed to reasonably accommodate Huerta, had discriminated against him both because he had filed a workers' compensation claim and because of his actual or perceived disability, had acted with malice, and that Gorges's conduct had been so outrageous that it exceeded all reasonable bounds usually tolerated by decent society. Given the jury's resolution of all the other contested issues in this case, we hold that the jury would have found the offers of re-employment insincere. Therefore, the failure of the trial court to admit the evidence of these offers was not reversible, and appellant's point of error is overruled.

### Conclusion

On the issue of lost wages in the future, we suggest a remittitur of damages representing lost wages in the future in excess of $72,639.84. See TEX.R.APP.P. 85(c). If appellee files the remittitur within fifteen days of the date of this opinion, we will reform the judgment to reflect this remittitur, the removal of prejudgment interest on the award for lost wages in the future, and the remittitur appellee has already made of part of the damages award for lost wages in the past. As modified, we will affirm the judgment. If appellee declines to file the remittitur within fifteen days of the date of this opinion, we must forgo any affirmation and reverse and remand the case entirely. See TEX.R.APP.P. 81(b)(1); *Hoechst Celanese Corp. v. Arthur Bros., Inc.*, 882 S.W.2d 917, 931 (Tex.App.— Corpus Christi 1994, writ denied).