NUMBER 13-99-275-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


BAY AREA HEALTHCARE GROUP, LTD., 

D/B/A COLUMBIA BAYVIEW PSYCHIATRIC CENTER
, Appellant,


v.



WILLIAM H. RAYBURN
, Appellee.

___________________________________________________________________


On appeal from the 214th District Court


of Nueces County, Texas.


___________________________________________________________________


OPINION ON MOTION FOR REHEARING



Before Chief Justice Seerden and Justices Dorsey and

Yañez

Opinion by Chief Justice Seerden



 We grant in part Bay Area Healthcare Group Ltd.'s motion for
rehearing insofar as it pertains to the issue of back pay. We withdraw
our opinion of August 31, 2000, and substitute this opinion in its place. 
In all other respects, Bay Area's motion for rehearing is denied.

Introduction


 The trial court entered judgment on William Rayburn's jury verdict
against his former employer, Bay Area Healthcare Group, Ltd., d/b/a
Columbia Bayview Psychiatric Center ("Bay Area") for age
discrimination under the Texas Commission on Human Rights Act. See
Tex. Lab. Code Ann. §§21.001 et. seq. (Vernon 1996 & Supp. 2000). 
The jury awarded Rayburn $83,000 in back pay, $25,000 in
compensatory damages, $50,000 in exemplary damages, and attorney's
fees. Bay Area appeals this judgment by four issues. We affirm the
judgment as modified.

Background


 William H. Rayburn began employment with Bay Area in October
of 1994 as director of maintenance at Bayview Psychiatric Center. 
Rayburn was hired by Irma Underwood, who was Bay Area's chief of
support services. At the time, Rayburn was 58 years old; he turned 59
the following month. Rayburn was thus a member of a protected age
group. See Tex. Lab. Code Ann. §21.101 (Vernon 1996)(TCHRA's age
discrimination provisions apply to individuals forty years of age or
older). 

 Bayview is a hospital for psychiatric or chemically dependent
patients, including children, adolescents, and adults. As director of
maintenance, Rayburn's duties included general managerial duties,
supervising two maintenance employees, as well as performing "hands-on" maintenance work. He further oversaw grounds, pool, and fence
maintenance for the hospital. Part of Rayburn's job was to prepare the
hospital for inspection by the Joint Commission on Accreditation of
Health Care Organizations, scheduled to take place in September of
1995. 

 Bay Area terminated Rayburn immediately following the inspection
in September of 1995, citing poor performance, misrepresentation of
facts, and safety concerns. Rayburn offered evidence to dispute these
proffered reasons for his termination. Rayburn also testified that Bay
Area suggested, prior to his termination, that he was from the "old
school," and that he quit because of his age.(1) Moreover, Bay Area has
never contended that Rayburn was unqualified for the position by
reason of a disability or other occurrence rendering him unfit for the
position for which he was hired. 

 After Rayburn's termination, Bay Area did not hire anyone else
with the job title "director of maintenance." At trial, Bay Area alleged
that it divided Rayburn's responsibilities between J. C. Hughes, who
assumed Rayburn's managerial duties, and Robert Martinez, a
maintenance technician, who assumed Rayburn's manual duties.

 Martinez, 38 years of age, testified that he took over Rayburn's
day-to-day responsibilities, occasionally calling Rayburn for advice
about the job. Martinez had worked at Bayview in 1994 and 1995 as
a maintenance technician under Rayburn's supervision. Martinez
denied taking over Rayburn's specific position, but admitted that he
was made a supervisor with a dollar an hour raise, supervising the
other maintenance technician that remained, Rey Rivera. According to
Martinez, Bay Area told him "You're gonna supervise Rey and you're
gonna supervise the hospital, whatever they need." Martinez testified
that J. C. Hughes did not provide direct or "on-hand" supervision at
Bayview after Rayburn's departure. 

 Rey Rivera, the other maintenance technician at Bayview, testified
that Martinez told him that he was put in charge of Bayview, and that
Martinez was taking over as his new boss. According to Rivera,
Martinez took over the majority of Rayburn's job responsibilities at
Bayview. Rivera testified that Hughes visited Bayview only once or
twice a month after Rayburn was terminated.

 J. C. Hughes testified that he did all the administrative work for
the maintenance department after Rayburn left. He testified that he
spoke to Martinez every day, and gave Martinez daily job assignments. 
Hughes said that he tried to visit Bayview daily until November, then
twice a week thereafter. 

 Rayburn brought suit against Bay Area for age discrimination and
defamation. After a four-day trial, the jury found Bay Area did not
defame Rayburn, but did find that age was a motivating factor in Bay
Area's decision to terminate Rayburn, and awarded damages and
attorney's fees. The trial court entered judgment on the verdict, but
refused to grant Rayburn additional equitable relief in the form of
reinstatement or front pay. By four issues, Bay Area attacks the legal
and factual sufficiency of both liability and damage issues 

Standards of Review


 In considering no evidence or legal sufficiency points of error, we
consider only the evidence and inferences from the evidence favorable
to the decision of the trier of fact, and disregard all evidence and
inferences to the contrary. See State Farm Fire & Cas. Co. v. Simmons,
963 S.W.2d 42, 44 (Tex. 1998); Burroughs Wellcome Co. v. Crye, 907
S.W.2d 497, 499 (Tex. 1995). If more than a scintilla of evidence
supports the challenged finding, the no evidence challenge must fail. 
See General Motors Corp. v. Sanchez, 997 S.W.2d 584, 588 (Tex.
1999); Mayberry v. Texas Dep't of Agric., 948 S.W.2d 312, 316
(Tex.App.--Austin 1997, pet. denied).

 In considering a factual sufficiency point, we may not substitute
our judgment for that of the trier of fact, but must assess all the
evidence and reverse for a new trial only if the challenged finding
shocks the conscience, clearly shows bias, or is so against the great
weight and preponderance of the evidence as to be manifestly unjust. 
See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.
1998); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

I.


Age Discrimination


 In its first issue, Bay Area argues that the evidence is not legally
or factually sufficient to support the jury's finding that Rayburn's age
was a motivating factor in Bay Area's decision to discharge him. Bay
Area further disputes the jury's implied finding that Bay Area's
articulated reasons for Rayburn's discharge were a pretext for
discrimination.

 Rayburn brought this action under the Texas Commission on
Human Rights Act ("TCHRA"). See Tex. Lab. Code Ann. §21.001 et. seq.
(Vernon 1996 & Supp. 2000). The TCHRA was drafted to correlate
with federal law; thus, Texas courts look to analogous federal court
decisions interpreting parallel provisions of Title VII of the Civil Rights
Act of 1964. Tex. Lab. Code Ann. §21.001 (Vernon 1996); see NME
Hosps., Inc. v. Rennels, 994 S.W.2d 142, 144 (Tex. 1999); Trico
Technologies Corp. v. Rodriguez, 907 S.W.2d 650, 653 (Tex.App.--Corpus Christi 1995, no writ); Farrington v. Sysco Food Svs., Inc., 865
S.W.2d 247, 251 (Tex.App.--Houston [1st Dist.] 1993, writ denied). 

 In discrimination cases, Texas courts apply the McDonnell
Douglas or Burdine analysis established by the United States Supreme
Court. See Reeves v. Sanderson Plumbing Prods., Inc., 120 S.Ct. 2097,
2106 (2000)(discussing McDonnell Douglas Corp. v. Green, 411 U.S.
729, 802-03 (1973) and Texas Dep't of Community Affairs v. Burdine,
450 U.S. 248, 252-53 (1981)); M. D. Anderson Hosp. v. Willrich, 28
S.W.3d 22, 24 (Tex. 2000)(per curiam); Texas Dept. of Human Servs.
v. Hinds, 904 S.W.2d 629, 636 (Tex. 1995).

 Under this burden-shifting analysis, the plaintiff has the initial
burden of proving a prima facie case of discrimination by a
preponderance of the evidence. Stanley Stores, Inc. v. Chavana, 909
S.W.2d 554, 559 (Tex.App.­Corpus Christi 1995, writ denied); Adams
v. Valley Fed. Credit Union, 848 S.W.2d 182, 186 (Tex.App.­Corpus
Christi 1992, writ denied). To make a prima facie case of
discrimination: (1) the plaintiff must prove that he was discharged; (2)
he was qualified for the position; (3) he was in the protected class at
the time of his discharge, and (4) he was replaced by someone outside
the protected class, or by someone younger, or otherwise show that he
was discharged because of age. Stanley Stores, Inc., 909 S.W.2d at
559; Adams, 848 S.W.2d at 186-87. The "qualification" requirement
concerns whether the plaintiff suffered a physical disability, loss of a
necessary license, or some other occurrence rendering him unfit for the
position for which he was hired. Stanley Stores, 909 S.W.2d at 559;
Adams, 848 S.W.2d at 188. When age discrimination is being shown
circumstantially through the comparison of a plaintiff's age by
comparing his treatment with that of a younger individual, the
difference in age between the two must be significant. Hartis v. Mason
& Hanger Corp., 7 S.W.3d 700, 705 (Tex.App.--Amarillo 1999, no pet.).

 If the plaintiff succeeds in proving a prima facie case, the burden
shifts to the defendant to articulate some legitimate, nondiscriminatory
reason for the employee's discharge. Stanley Stores, 909 S.W.2d at
560; Adams, 848 S.W.2d at 187-88. If the defendant carries this
burden, the plaintiff must then prove by a preponderance of the
evidence that the legitimate reasons offered by the defendant were not
its true reasons, but were rather a pretext for discrimination. Stanley
Stores, 909 S.W.2d at 560; Adams, 848 S.W.2d at 187-88. Despite the
shifting burden of proof, the plaintiff at all times retains the ultimate
burden of persuading the trier of fact. Stanley Stores, 909 S.W.2d at
560; Adams, 848 S.W.2d at 187-88.

 When, as here, a case has been fully tried on its merits, we do not
focus on the burden shifting scheme described above. See, e.g.,
Rubenstein, 218 F.3d at 402. Once the case has been submitted to the
jury, the adequacy of a party's showing at any particular stage of the
McDonnell Douglas analysis is unimportant. Travis v. Board of Regents
of Univ. of Texas, 122 F.3d 259, 263 (5th Cir. 1997), cert. denied, 118
S.Ct. 1166 (1998). Instead, we inquire whether the record contains
legally and factually sufficient evidence to support the jury's ultimate
findings. Rutherford v. Harris County, Texas, 197 F.3d 173, 180-81 (5th
Cir.1999); Smith v. Berry Co., 165 F.3d 390, 394 (5th Cir. 1999).
Rayburn most show that Bay Area's purported reasons for terminating
him are pretextual and that Bay Area engaged in illegal discrimination
by legally and factually sufficient evidence. See Rutherford, 197 F.3d at
180-81; Travis, 112 F.3d at 263.

 The record shows that Rayburn was well qualified for his position
at Bayview. A former military man, Rayburn had previously worked for
Driscoll Children's Foundation Hospital and Memorial Medical Center. 
At Driscoll, Rayburn served as director of preventive maintenance, and
corrected deficiencies identified by the Joint Commission, thus enabling
Driscoll to attain accreditation. Between Driscoll and Memorial,
Rayburn had served as a director of maintenance through four separate
inspections by the Joint Commission.

 Irma Underwood, who originally hired Rayburn and served as his
supervisor until May of 1995 when she resigned, testified that Rayburn
always did his job "exceptionally well," and that he was always honest
and straightforward. Underwood said that if something needed to be
done, Rayburn reported what needed to be done, and usually, had a
method for resolving the problem. Underwood testified that Rayburn
was constantly working. Underwood's evaluation of Rayburn was
exemplary. 

 In contrast, Bay Area contended that Rayburn's job performance
was unsatisfactory. At trial and on appeal, Bay Area provided several
different reasons why Rayburn's performance was unacceptable. 
According to a typewritten document entitled "Disciplinary Counseling
. . . Unsatisfactory Job Performance Violation of Safety Requirements,"
Rayburn was terminated because he "was aware that unauthorized
shower heads were being purchased and placed in patient care areas,"
and "he was aware of the safety hazard this type of shower presents"
to psychiatric patients who are determined to inflict bodily harm to
themselves. Janie Harwood, chief executive officer of Bay Area,
testified that she decided to terminate Harwood because of his poor
performance and because he misrepresented facts pertaining to the
hospital's physical plant. In her testimony, Harwood also references the
"Statement of Conditions" as a separate rationale for terminating
Rayburn, however, she does not make a specific complaint regarding
that document and Rayburn's performance. 

 In our analysis, the evidence must reflect that Rayburn showed
that these reasons were a pretext for intentional age discrimination. We
will address each of these issues in turn. 

 As noted above, Bay Area contended that Rayburn knew that
inappropriate shower heads were being purchased and placed in
patient care areas, causing a safety hazard to patients. Under the Joint
Commission standards, the hospital was required to have "safety" or
flush mount shower heads, or breakaway shower heads, in order to
prevent suicidal patients from utilizing the shower heads to hang
themselves. Bay Area contended that the evidence showed that:
Rayburn refused to replace existing non-compliant showerheads
because Bay Area had turned down Rayburn's proposal to expansively
remodel the bathrooms; an investigation conducted by Harwood
showed that Rayburn continued to order non-compliant showerheads
despite knowing of the danger to patients; Rayburn failed to inform the
administration of the need for safety shower heads; Rayburn
represented that the hospital had safety shower heads, and if not, he
would replace them; and that the hospital did not have compliant
shower heads at the time of inspection. 

 In contrast, Irma Underwood, Rayburn's former supervisor,
testified that she had previously informed Bay Area of the hazards
represented by the shower heads when she submitted Rayburn's
proposal to remodel the hospital's bathrooms. She said that Rayburn
had replaced the shower heads in the adolescent unit, and that Bay
Area had refused to allow her to replace the shower heads in the adult
unit. Nevertheless, Underwood testified that she and Rayburn had
managed to replace some of the remaining non-compliant shower
heads. Underwood further testified that Rayburn did not have the
authority to order shower heads; all purchases had to go through
administration, except for routine nuts and bolts, and that it was a
problem ordering equipment, including safety equipment. 

 In contrast to Harwood's contention that Rayburn continued to
order non-compliant showerheads, Hughes testified that he found
compliant shower heads in the hospital's supply room after Rayburn
was terminated.

 The jury is the sole judge of the credibility of the witnesses, and
could have believed Underwood's testimony regarding the shower
heads, rather than the testimony of the witnesses for Bay Area. Silcott
v. Oglesby, 721 S.W.2d 290, 293 (Tex. 1986); Gorges Foodservice, Inc.
v. Huerta, 964 S.W.2d 656, 666 (Tex.App.--Corpus Christi 1997, no
writ). 

 Moreover, the jury may have determined that the issue of the
shower heads was of little importance. The Joint Commission gave
Bayview a Type II recommendation for failing to have safety shower
heads, rather than a more serious Type I recommendation. Rayburn
testified that the Joint Commission did not require the replacement of
the shower heads because the hospital was moving its physical
location. Further, the evidence showed that, after "discovering" the
non-compliant showerheads and terminating Rayburn, Bay Area
replaced the shower heads in stages rather than totally and
immediately. The jury may simply have inferred that Bay Area itself did
not consider the issue of great importance, and that this matter was a
mere pretext for terminating Rayburn.

 In 1995, the Joint Commission required that hospitals submit a
"Statement of Conditions," which is a detailed physical description of
the hospital, as part of the inspection and accreditation process. Bay
Area argued that Rayburn's draft "Statement of Conditions" was
inaccurate and misrepresented the physical condition of the hospital,
and that Rayburn failed to inform Hughes that the hospital was not built
according to blueprints. 

 In January of 1995, Rayburn completed a draft "Statement of
Conditions" by reviewing the hospital blueprints and indicating his
answers in pencil. However, the blueprints had not been followed
when the hospital was built, therefore, Rayburn's draft Statement was
inaccurate because it was based on the blueprints rather than an actual
physical inspection of the plant. Rayburn signed the draft, and stored
it in his office, thereafter making periodic modifications to the draft. 

 In August of 1995, Hughes told Rayburn that he was going to hire
an independent contractor, W. L. Dick & Associates, to perform a
detailed physical inspection of the plant and complete the Statement
of Conditions. According to Hughes, Rayburn told him he had prepared
a draft Statement and gave the draft to him; according to Rayburn, the
draft disappeared from his office sometime prior to the inspection. By
this time, Rayburn was aware that the blueprints did not reflect the
hospital as built, but he did not so inform Hughes. Harwood was
concerned the Rayburn's draft misrepresented the hospital's physical
condition.

 The jury was free to determine that Rayburn's document was in
fact a draft and a work-in-progress, and that Rayburn should not be
held responsible for the draft as though it were a completed product. 
Further, the jury may have considered that Hughes was Rayburn's
supervisor and had some responsibility for inspecting the premises and
identifying discrepancies between the blueprints and the physical plant. 
Finally, the jury may have determined that Rayburn did not have the 
responsibility to complete the Statement of Conditions given that Bay
Area had specifically retained W. L. Dick to complete the Statement
before Bay Area realized that Rayburn had been working on a draft. The
jury may have thus inferred that the problems regarding Rayburn's draft
Statement of Conditions were a mere pretext for his termination.

 Bay Area points to several other issues to support its defense that
Rayburn's performance was inadequate. Bay Area argued that Rayburn
failed to seal penetrations despite repeated instruction to do so, yet told
Bay Area that he had sealed the penetrations. In order to meet the
standards set by the Joint Commission, any holes or penetrations in the
hospital's walls would have to be intact or sealed to prevent the
migration of smoke or fire throughout the hospital. Bay Area further
argues that the draft Statement showed that penetrations had been
sealed. 

 The evidence adduced at trial showed that, after the inspection by
W. L. Dick & Associates, Rayburn and the maintenance technicians
sealed some or all of the penetrations prior to the inspection by the
Joint Commission. Rayburn testified without contradiction that the
Joint Inspection did not require remedying such physical deficiencies
because the hospital would be moving to a separate physical location. 
Moreover, Rayburn argued at trial that an "informal" reprimand that he
had received regarding the penetrations was fraudulently created after
Rayburn's termination. We further note that Rayburn worked long
hours during the weeks before the inspection, and the jury may have
simply determined that Rayburn did everything within his power to
remedy the hospital's deficiencies within the allotted time frame, and
that this rationale for terminating Rayburn was a mere pretext.

 Bay Area further also argued that Rayburn's job performance was
inadequate because he failed to report two fire alarms and an electrical
outage at the hospital at the time that they occurred. Evidence showed
that the fire alarm went off twice during the month of August, although
no fire was involved in either instance, and that the hospital lost
electrical power on one occasion for approximately fifty minutes during
the latter part of that month. Rayburn did not tell Hughes, the safety
officer, about these instances until the safety committee meeting on
August 31, 1995. 

 Rayburn testified that he had not been given instructions to report
such events at the time of occurrence, and that he did not have
Hughes's home or mobile telephone numbers. Rayburn further testified
that it was customary to report such instances at safety meetings. 
Accordingly, the jury may have inferred that this reason for terminating
Rayburn was a mere pretext.

 The evidence at trial showed that Bay Area failed to follow its own
disciplinary procedures in reprimanding Rayburn and terminating him. 
Hughes and Tom Harrison, the human resources director, gave Rayburn
an "informal" reprimand on September 5, 1995. Although Hughes
created a typewritten document pertaining to the informal reprimand,
Hughes failed to utilize a form required by Bay Area for disciplinary
counseling, and further failed to procure Rayburn's signature on the
counseling form as required by Bay Area. 

 At the counseling session, Rayburn requested that Bay Area
furnish him its complaints in writing, yet Hughes and Harrison refused
to give him a copy of the reprimand. In fact, Hughes indicated that they
would not put a written reprimand in Rayburn's file. 

 Harrison agreed that proper documentation was very important in
the field of nursing, and that written documents are generally initialed,
signed, or dated. Harrison conceded that Rayburn's written reprimand
was unsigned and undated. Harrison testified that most of the Bay
Area managers used a specific disciplinary form with fill-in blanks, but
Hughes generally created his own typed reprimand because he felt that
the Bay Area form did not provide sufficient space for his comments.

 Harrison conceded that they failed to follow the procedures
specified in Bay Area's disciplinary notice form by failing to ask Rayburn
to review his reprimand, confirm his understanding of it, and sign it,
acknowledging notification of the problem. Harrison was "really not
sure why it wasn't done, at that point." Harrison admitted that it was
particularly important to obtain the employee's signature so that there
would be a record of the disciplinary action. Harrison also admitted that
he was in charge of the meeting "to make sure that, if we do
disciplinary action it's done properly, and that it's given the 'both sides
of the story' type thing."

 Harrison acknowledged that both the informal reprimand and
Rayburn's termination memo lacked the ordinary indicia of memoranda,
such as a date, information indicating who it was addressed to and
from, and a signature. Harrison said that following the typical
memorandum format would have been a better practice, but that
Hughes had a habit of failing to do so. In response, Rayburn showed
the jury several memoranda from Hughes that were in a typical
memorandum format.

 Rayburn testified that he was fired because of his age, and that
the reason Bay Area gave for his termination was false.

 While we agree with Bay Area that there was some evidence that
it had a legitimate, non-discriminatory motive for terminating Rayburn,
the jury was the sole evaluator of the witnesses' credibility and entitled
to resolve conflicts in the testimony as it saw fit. Silcott, 721 S.W.2d
at 293; Gorges Foodservice, Inc., 964 S.W.2d at 666. The jury's verdict
was supported by more than a scintilla of evidence, and was not so
against the great weight and preponderance of the evidence as to be
manifestly unjust. Maritime Overseas Corp., 971 S.W.2d at 406-07. 
We conclude that Rayburn presented legally and factually sufficient
evidence to support the jury's finding that Rayburn's age was a
motivating factor in Bay Area's decision to discharge him. Bay Area's
first issue is overruled.

II.


Back Pay Damages


 In its second issue, Bay Area argues that the jury's finding of
$83,000 in back pay damages is not supported by the evidence. First,
Bay Area contends that the evidence is not factually sufficient to
support the back pay award because the jury failed to offset the back
pay by Rayburn's unemployment compensation and interim earnings. 
Second, Bay Area argues that the evidence is not legally or factually
sufficient to support an award of back pay after December of 1995
because Rayburn's employment would have been terminated when
Bayview's campus was closed and the facility relocated. Finally, Bay
Area contends that the evidence conclusively establishes, as a matter
of law, that Rayburn failed to mitigate his damages after November of
1997 by failing to seek employment after that date. 

 The trial court has discretion to award back pay as equitable relief
in an age discrimination lawsuit. Tex. Lab. Code Ann. §21.258(b)(1)
(Vernon 1996). However, in awarding back pay, the court must deduct
interim earnings, workers' compensation benefits, and unemployment
compensation benefits. Tex. Lab. Code Ann. §21.258(c)(Vernon 1996);
Stanley Stores, Inc., 909 S.W.2d at 563.

 The jury awarded Rayburn $83,000 in back pay. The jury was
instructed that "back pay" is that amount of wages and employment
benefits that Rayburn would have earned if he had not been terminated,
less any wages, unemployment compensation benefits or workers'
compensation benefits he received in the interim. The jury was further
instructed to deduct from back pay "the amount of money, if any, that
you find William Rayburn could have earned by exercising reasonable
diligence in seeking other employment."

A.


Offset


 Bay Area contends that the jury failed to offset the finding for back
pay with Rayburn's interim earnings and unemployment compensation
benefits. Bay Area argues that Rayburn's annual salary was $30,000,
that he had been terminated three years and one and a half months by
the time trial was completed, and that undisputed evidence established
interim earnings and unemployment compensation benefits of
$23,824.65. Bay Area thus contends that Rayburn was entitled to only 
$69,925.35 in back pay ($30,000 annually for three years and one and
one half months, or $93,750, less $23,824.65).

 The right to an offset is an affirmative defense, and the burden of
pleading and proving the facts necessary to support an offset is on the
party making the assertion. See Brown v. American Transfer & Storage
Co., 601 S.W.2d 931, 936 (Tex. 1980), cert. denied, 449 U.S. 1015
(1980). However, as noted previously, in awarding back pay, the court
must deduct interim earnings, workers' compensation benefits, and
unemployment compensation benefits. Tex. Lab. Code Ann.
§21.258(c)(Vernon 1996) (emphasis added); Stanley Stores, Inc., 909
S.W.2d at 563.

 Rayburn testified that he made "approximately" $30,000 annually. 
Rayburn further testified that he worked a substantial amount of
overtime, particularly with regard to preparing Bayview for inspection. 
The record reflects that Rayburn was a salaried employee, but does not
reflect whether or not Rayburn received overtime pay or other benefits
as a result of overtime work. 

 Rayburn received a raise from $14.00 per hour to $14.42 per hour
during his first year of employment with Bay Area. A jury may
rationally conclude that, but for an employer's discrimination, the
discharged employee would have received additional raises during the
interim before trial. See Mayberry v. Texas Dept. of Agriculture, 948
S.W.2d 312, 317 (Tex.App.--Austin 1997, writ denied). However, the
record in the instant case fails to include documentation or testimony
establishing whether or not Bay Area gave employees raises during
subsequent years, the criteria for any such raises, and the amount of
any raises. 

 The jury has the discretion to award damages within the range of
evidence presented at trial, so long as a rational basis exists for its
calculation. Id. There is a discrepancy of approximately $13,000
between the jury's award and the figure Bay Area has calculated for
back pay. Rayburn argues that this discrepancy is not so great that it
cannot be reconciled by allowing for overtime pay or occasional raises
during the thirty-seven month period of lost employment. However, the
evidence pertaining to Rayburn's alleged overtime or potential raises is
so weak that it does no more than create a mere surmise or suspicion
about such damages. See Kindred v. Con-Chem., Inc., 640 S.W.2d 61,
63 (Tex. 1983). Therefore, the evidence is no more than a scintilla and
cannot survive a legal sufficiency challenge. We conclude that the
evidence was sufficient to establish that Rayburn was entitled to
$30,000 annually for three years and one and one half months, or
$93,750, less $23,824.65 for interim earnings and compensation
benefits, or $69,925.35 in back pay. See Tex. Lab. Code Ann.
§21.258(c)(Vernon 1996); Stanley Stores, Inc., 909 S.W.2d at 563. We
sustain this issue, and modify the judgment to reflect a back pay award
of $69,925.35. 

B.


Termination of Employment


 Bay Area argues that the evidence is not sufficient to support an
award of back pay after December of 1995 because Rayburn's
employment would have been terminated when Bayview was relocated
in December of 1995 to the campus of South Texas Rehab Hospital. 
Rayburn testified that:

 So it was a good economic move. So everybody was
supposed to gear up to move over to South Texas Rehab
Hospital. But Mrs. Harwood made it very obvious that the
services of Bayview Hospital, the service departments,
which would be Maintenance, Housekeeping and Dietary
would be the hardest hit and, probably, would not be
moving to the new facility. They would make every
opportunity they could to give us resumes, talk to other
hospitals and see if they could find other places for us to
work.


Rayburn and Hughes had both been told that JoAnn Baker, CEO of
South Texas Rehab, would make the decision on who would stay
employed and who would be terminated. Rayburn discussed this issue
with Hughes:

 And Mr. Hughes and I talked and he said, well, if he was as
close to retirement as I was, he would just go ahead and
retire. But since he wasn't as old as I was, that he needed
to work another five or six years. Kind of leave me under the
impression, what's he want me to do, quit?


Rayburn testified that these remarks caused him concern because it
was "obvious that one of us was not gonna have a job." Rayburn
testified that he had applied for the position of chief support of general
services at South Texas Rehab. The evidence at trial showed that at
least one member of the maintenance department, Martinez, who had
less experience and fewer qualifications than Rayburn, survived the
merger of the two physical plants.

 We find that the foregoing evidence is insufficient to establish that
Rayburn would have been terminated in December of 1995. We
overrule appellant's second issue.

C.


Failure to Mitigate


 A wrongfully discharged employee has a duty to mitigate damages
by making a good faith effort to obtain and retain employment. Ford
Motor Co. v. Equal Employment Opportunity Comm'n, 458 U.S. 219,
231-34 (1982); Gulf Consol. Int'l Inc. v. Murphy, 658 S.W.2d 565, 566
(Tex. 1983)(opinion on rehearing); Gorges Foodservice, Inc., 964
S.W.2d at 669. Mitigation is a defensive issue upon which Bay Area
bore the burden of proof at trial. Texas Animal Health Comm'n v.
Garza, 27 S.W.3d 54, 62 (Tex.App.--San Antonio 2000, no pet.);
Gorges, 964 S.W.2d at 669. Mitigation of damages is ordinarily a
question of fact for the jury. See Hygeia Dairy Co. v. Gonzalez, 994
S.W.2d 220, 224 (Tex.App.--San Antonio 1999, no pet.). The adequacy
of an employee's efforts to mitigate and the reasonableness of an
employee's explanation for rejecting a job offer are fact questions
properly left to the jury. Texas Animal Health Comm'n, 27 S.W.3d at
62; Gorges, 964 S.W.2d at 669; Pacesetter Corp. v. Barrickman, 885
S.W.2d 256, 263 (Tex.App.--Tyler 1994, no writ).

 The jury was instructed to subtract wages, unemployment
compensation benefits, or workers compensation benefits, and was
further instructed to "deduct from back pay the amount of money, if
any, that you find William Rayburn could have earned by exercising
reasonable diligence in seeking other employment." 

 After losing his job, Rayburn applied for positions through the
unemployment workforce commission and through a veteran's
program. He held several different jobs, working at the Naval Air
Station--Corpus Christi, at Saratoga Medical Center, and for A-Plus
Services. Rayburn was also the owner and proprietor of an antique
store, and worked at that establishment continually, although it had lost
money off and on over the twenty-nine years he had owned it. Rayburn
testified that it is hard for an older individual to find a job.

 At the time of trial, Rayburn had last held employment outside of
his antique store on July 7, 1997. He had not completed a job
application since November of 1997, at which time he was 62 years of
age, but testified that he would have continued to investigate any job
notifications that he received. We note that there was some evidence
that Rayburn lost at least one job opportunity because Bay Area, as
Rayburn's former employer, failed to provide requested documentation
to Rayburn's prospective employer.

 Bay Area contends that Rayburn's failure to complete a job
application after November of 1997 conclusively establishes that
Rayburn failed to mitigate his damages after that date. However, there
was sufficient evidence before the jury from which the jury could infer
that Rayburn used reasonable diligence to obtain another job even after
this date. The jury heard testimony that it is hard for older people to
find employment, and in November of 1997, Rayburn was 62 years of
age. Moreover, Rayburn continued to work at his antique store after
November 1997. The mere fact that the antique store apparently failed
to show a profit after that date is not determinative regarding Rayburn's
efforts to mitigate his damages. We overrule appellant's second issue. 
 

III.


Compensatory Damages


 In its third issue, Bay Area argues that the jury's finding of
$25,000 for compensatory damages is not supported by legally or
factually sufficient evidence.

 Plaintiffs may recover compensatory damages under the Texas
Human Rights Act. Tex. Lab. Code Ann. §21.2585(a)(1) (Vernon 1996
& Supp. 2000).(2) "Compensatory damages" include "future pecuniary
losses, emotional pain, suffering, inconvenience, mental anguish, loss
of enjoyment of life, and other nonpecuniary losses," but may not
include back pay, interest on back pay, or other equitable relief
authorized under section 21.258(b) of TCHRA. See Tex. Lab. Code Ann.
§21.2585(c),(d) (Vernon 1996).

 The jury awarded Rayburn $25,000 as compensatory damages. 
The jury was instructed that compensatory damages include future
pecuniary losses, emotional pain, suffering, inconvenience, mental
anguish, loss of enjoyment of life, and other nonpecuniary damages. 
Bay Area argues that Rayburn's evidence fails to rise to the "high
degree of mental pain and distress" required to support an award of
mental anguish damages, and that there is no evidence to support the
award of compensatory damages.

 In Parkway Co. v. Woodruff, the Texas Supreme Court held that
an award of damages for mental anguish requires evidence of a "high
degree of mental pain and distress" that is "more than mere worry,
anxiety, vexation, embarrassment, or anger." Parkway Co. v. Woodruff,
901 S.W.2d 434, 444 (Tex. 1995); see also Stevens v. Nat'l Educ. Ctrs.,
Inc., 11 S.W.3d 185, 185 (Tex. 2000); Norwest Mtg., Inc. v. Salinas,
999 S.W.2d 846, 862 (Tex.App.--Corpus Christi 1999, pet. denied). An
award of mental anguish damages can survive a legal sufficiency
challenge when a plaintiff has introduced direct evidence of the nature,
duration, and severity of his mental anguish. Parkway, 901 S.W.2d at
444. Such evidence can take the form of the claimant's own testimony. 
Id.

 The jury charge in this matter instructed the jury that:

 The term "MENTAL PAIN AND ANGUISH" implies a relatively
high degree of mental pain and distress. It is more than
mere disappointment, anger, resentment or embarrassment,
although it may include all of these. It includes a mental
sensation of pain resulting from such painful emotions as
grief, severe disappointment, indignation, wounded pride,
shame, despair and/or public humiliation.


Rayburn's testimony fairly conveys the nature of his mental anguish. 
Specifically, Rayburn testified that he was "devastated" during the
termination meeting, and that he had never been treated like that in his
life. He was further devastated when Bay Area "paraded" him through
all of the employees in escorting him from the premises after
termination, and when Bay Area told security that if he "came back on
the premises to call the police." Rayburn had to inform potential
employers that the reason for his discharge was a "trumped up safety
charge." He testified that he was worked up, "put back," and hurt.

 Rayburn also testified about the duration of his mental anguish. 
Specifically, Rayburn testified that these feelings continued from the
time of his termination through trial. 

 Finally, Rayburn testified about the severity of his mental anguish. 
He indicated that he had problems sleeping because he was thinking of
the termination, and because he was concerned about its financial
aspects. He was unable to share these feelings with his wife, who was
terminally ill at the time. 

 We conclude that the foregoing evidence is legally sufficient to find
that Rayburn suffered mental anguish, and that the jury's award is not
unsupported by the evidence or against the great weight and
preponderance of the evidence. Moreover, we note that the jury may
or may not have awarded the full $25,000 for mental anguish, or may
have awarded some amount for future pecuniary losses. It would be
improper for us to speculate on how the jury divided its award among
the various elements of damages. See Hernandez v. American
Appliance Mfg. Corp., 827 S.W.2d 383, 389 (Tex.App.--Corpus Christi
1992, writ denied).

 A challenge to a multi-element damages award should address all
of the elements and show that the evidence is insufficient to support
the damages award considering all of the elements. Price v. Short, 931
S.W.2d 677, 688 (Tex.App.­Dallas 1996, no writ); Greater Houston
Transp. Co. v. Zrubeck, 850 S.W.2d 579, 589 (Tex.App.­Corpus Christi
1993, writ denied). 

 While Bay Area argues that there was no evidence of mental
anguish, Bay Area does not address evidence pertaining to future
pecuniary loss or other nonpecuniary damages. We therefore cannot
further analyze Bay Area's challenge regarding Rayburn's compensatory
damages because this would entail speculation about how the jury
divided its award among the various elements comprising
compensatory damages. See Thomas v. Oldham, 895 S.W.2d 352,
359-60 (Tex. 1995). 

 Appellant's third issue is overruled. 

IV.


Malice or Reckless Disregard


 In its fourth issue, Bay Area argues that the jury's findings that it
acted with malice or reckless disregard and that Rayburn was entitled
to $50,000 in punitive damages are not supported by legally or factually
sufficient evidence. Bay Area argues that it did not act with malice or
reckless indifference, and further argues that the case should be
remanded to the trial court for further proceedings and a new trial in
light of Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999).

 The Texas Human Rights Act allows recovery of punitive damages
when the evidence demonstrates that the defendant engaged in a
discriminatory practice "with malice or with reckless indifference to the
state-protected rights of an aggrieved individual." Tex. Lab. Code Ann.
§21.2585(b) (Vernon 1996 & Supp. 2000). 

A.


Sufficiency of the Evidence


 In this case, the jury found by clear and convincing evidence that
Bay Area acted with malice or reckless indifference. Malice was defined
as

 a specific intent to cause substantial injury to Rayburn, or an
act or omission which, when viewed objectively from the
standpoint of defendants at the time of its occurrence,
involved an extreme degree of risk, considering the
probability and magnitude of the potential harm to others,
and of which defendants had actual, subjective, awareness
of the risk involved, but nevertheless proceeded with
conscious indifference to the rights, safety, or welfare of
others.


The jury was instructed that exemplary damages were an amount that
could be awarded as a penalty or by way of punishment, and that
factors to be considered in awarding exemplary damages, if any, were
the nature of the wrong, the character of the conduct involved, the
degree of culpability of the wrongdoer, the situation and sensibilities of
the parties concerned, the extent to which such conduct offends a
public sense of justice and propriety, and the net worth of Bay Area. 
The jury awarded Rayburn $50,000 in exemplary damages.

 A court of appeals confronted with a challenge to the factual
sufficiency of an exemplary damages award must detail the relevant
evidence explaining why the evidence supports or does not support the
award in light of the Kraus factors. Transportation Ins. Co. v. Moriel,
879 S.W.2d 10, 31 (Tex. 1994).

 Sufficient evidence was presented to show that Bay Area's
wrongful acts of discrimination against Rayburn were done with malice
or reckless indifference. The jury heard evidence that Rayburn worked
late most evenings during the weeks preceding the inspection by the
Joint Commission, and worked until midnight for several consecutive
nights to help Bay Area receive accreditation, yet Bay Area terminated
Rayburn during the employees' celebration immediately after the
hospital received accreditation. Although there was no evidence that
Rayburn presented any threat to the hospital or its employees, the jury
heard evidence that Hughes and Harrison escorted Rayburn to his office
to pack his belongings, and then escorted him from the premises,
instructing a security guard to call the police if Rayburn attempted to
return. The jury heard evidence that Bay Area violated its own
procedures by refusing to give Rayburn documentation about his
"informal reprimand," yet demanded that he respond to the reprimand
in writing. Evidence was adduced that Bay Area refused to allow
Rayburn to respond to the charges against him. Rayburn introduced
evidence that Bay Area failed to follow several other internal policies
and procedures for Rayburn's disciplinary counseling and eventual
termination. Further, there was some evidence from which the jury
could have inferred that Bay Area fabricated documentation pertaining
to Rayburn's discharge. 

 Finally, we note that the evidence adduced at trial was sufficient
to support the jury's implicit finding that Bay Area's purported reasons
for claiming Rayburn to be incompetent were disingenuous at best. For
instance, the evidence established that Bay Area initially refused to pay
for the installation of safety showerheads, yet ostensibly terminated
Rayburn for his failure to install these showerheads. Further, despite
Rayburn's termination on the alleged grounds that Rayburn endangered
patients by failing to install compliant showerheads, Bay Area did not
act with any great urgency in completing the installation of compliant
showerheads.

 This evidence is sufficient to allow the jury to assess the nature of
the wrong, the character of the conduct, and the degree of culpability
of the wrongdoer. See Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908,
910 (Tex. 1981). This evidence was also sufficient to allow the jury to
evaluate the situation and sensibilities of the parties concerned by
establishing that Bay Area was a corporation with a substantial net
worth and Rayburn was an individual nearing retirement age, who
would have difficulties obtaining another job given the fact that he had
ostensibly been discharged for endangering patients. See id. Based on
all of this evidence, we are reluctant to substitute our sense of a "public
sense of justice and propriety" for that of the jury. See id. However, we
will say that the jury could have determined that the facts of this case
were substantially offensive to a public sense of justice and propriety. 
Cf. id. We conclude that the exemplary damages award of $50,000
was supported by evidence, and was not so against the great weight
and preponderance of the evidence as to be manifestly unjust, and was
supported by more than a scintilla of evidence. 

 We hold that legally and factually sufficient evidence was
presented to show that Bay Area's actions were done with malice or
reckless indifference. 

B.


Change in Law


 Bay Area argues that this case should be remanded to the trial
court for further proceedings and a new trial in light of the recent United
States Supreme Court decision in Kolstad v. American Dental Ass'n,
527 U.S. 526 (1999). In Kolstad, the court held that "an employer may
not be vicariously liable for the discriminatory employment decisions of
managerial agents where these decisions are contrary to the employer's
'good faith efforts to comply with Title VII.'" Kolstad, 119 S.Ct. at 2129. 
This good faith defense is designed to "avoid undermining the
objectives underlying Title VII"; the statute's primary objective is a
prophylactic one"--"not to provide redress but to avoid harm." Id. 
Because Kolstad was decided more than six months after the trial of
this cause, Bay Area did not plead this affirmative defense, nor did it
adduce evidence pertaining to this issue. 

 Supreme Court decisions apply retroactively and prospectively to
all cases on direct appeal whenever applied to the litigants before the
Court. Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97 (1993). 
Nevertheless, this Court disagrees that a new trial is warranted in light
of Kolstad. See Wal-Mart Stores, Inc. v. Itz, 21 S.W.3d 456, 479
(Tex.App.--Austin 2000, pet. filed); Deffenbaugh-Williams v. Wal-Mart
Stores, Inc., 188 F.3d 278, 283-84 (5th Cir. 1999); Kimbrough v. Loma
Linda Dev., 183 F.3d 782 (8th Cir. 1999). We do not find that Kolstad
represented such a sudden shift in the law as to require a new trial in
the interests of fairness. In this regard, we note that there was some
authority similar to Kolstad prior to the trial of this matter, and that good
faith is generally utilized as the natural converse to malice or reckless
indifference in defending a claim for punitive damages. We further note
that Bay Area introduced evidence at trial regarding its employment of 
other older employees.

 In light of our holding, we do not find it necessary to reach the
issue of whether this Court has the authority to remand the case to the
trial court in light of a change in the applicable law during the pendency
of the appeal. See Blair v. Fletcher, 849 S.W.2d 344, 345 (Tex.
1993)(per curiam); compare Tex. R. App. P. 60.2(f)(granting the supreme
court the authority to vacate the lower court's judgment and remand
the case for further proceedings in light of changes in the law) with Tex.
R. App. P. 43.2, 43.3 (allowing remand when trial court's judgment is
vacated, when necessary for further proceedings, or the interests of
justice require).

 We overrule Bay Area's fourth issue.

Front Pay


 In his sole cross-point, Rayburn argues that the trial court abused
its discretion by awarding Rayburn neither front pay or reinstatement. 
The TCHRA authorizes reinstatement, and Texas courts have previously
found that an award of front pay is a legitimate exercise of the trial
court's equity powers under the Act. Tex. Lab. Code Ann. §21.258
(Vernon 1996); see Wal-Mart Stores v. Davis, 979 S.W.2d 30, 44
(Tex.App.--Austin 1998, pet. denied); Stanley Stores, 909 S.W.2d at
561-62.

 While some courts have held that an award of either front pay or
reinstatement is necessary to make the claimant whole, other courts
have analyzed the issue differently. Compare, e.g., United States EEOC
v. W & O, Inc., 213 F.3d 600 (11th Cir. 2000)(in addition to back pay,
prevailing Title VII plaintiffs are presumptively entitled to either
reinstatement or front pay); with Tennes v. Massachusetts, 944 F.2d
372, 381 (7th Cir. 1991)(neither reinstatement nor front pay are
mandatory relief for a prevailing plaintiff under the ADEA). The parties
have not cited, and we have not found, any cases addressing this
conflict under Texas law. Nevertheless, we need not address this issue.

 Under the Texas Rules of Appellate Procedure, a party must
perfect its own independent appeal as a prerequisite to seeking relief
from the judgment. See Tex. R. App. P. 25.1(c). Rayburn failed to
perfect appeal, and consequently this issue is consequently not properly
before the Court.

Conclusion


 We affirm the trial court's judgment as to compensatory damages,
exemplary damages, and attorney's fees. We modify the trial court's
judgment regarding back pay: Rayburn shall recover $69,925.35 for
back pay. As modified, we affirm the judgment. 


 

 ROBERT J. SEERDEN, Chief Justice


Do not publish
.

Tex. R. App. P. 47.3.


Opinion on Motion for Rehearing delivered 

and filed this 28th day of December, 2000.

 

1. Mere "stray remarks" are typically insufficient to show
discrimination; however, these remarks provide some evidence of
discriminatory intent because they were (1) related to the protected
class of persons of which the plaintiff is a member; (2) proximate in
time to the termination; (3) made by individuals with authority over
the employment decision; and (4) related to the employment decision
at issue. See Rubenstein v. Adminstrators of the Tulane Educ. Fund,
218 F.3d 392, 400-01 (5th Cir. 2000). 
2. This section of the TCHRA was amended in 1999; however, the
1999 amendments do not affect section 21.2585 as applied to the
instant case. See Tex. Lab. Code Ann. §21.2585 and historical note
(Vernon Supp. 2000)